HERMAN R. BALTZER and WILLIAM G. TAAKS v. THE STATE OF NORTH CAROLINA.

*Jurisdiction—Claim Against the State Constitution.*

1. The jurisdiction conferred upon the Supreme Court by Art. 4, Sec. 9 of the Constitution to hear claims against the State is confined to an examination of and adjudication of the legal validity of such claims; no power to enforce its judgment is given the Court; its decisions are merely recommendatory to the Legislature, who may provide for the judgment of the claims, if it sees proper to do so.

2. The amendment incorporated into Art. 1, Sec. 6 of the Constitution
   in 1880, prohibiting the General Assembly from paying, or assum-
   ing to pay, directly or indirectly, any debt incurred by authority
   of the Convention of 1868, or by the Legislature at the special
   session of that year, or of the regular session of 1868-'69, and
   1869-'70, took away the jurisdiction of the Supreme Court, under
   Art. 4, Sec. 9, to hear claims against the State, founded upon
   obligations alleged to have been incurred by the State by virtue
   of ordinances and statutes passed within the prescribed period.
3. This amendment to the Constitution of North Carolina does not con-
   flict with the Constitution of the United States.
4. The bonds issued by the State of North Carolina in aid of the Chat-
   ham Railroad Company, pursuant to the provisions of Ch. 14,
   Laws of 1868, were null and void.

This is an ACTION, brought in the Supreme Court, under
Art. 4, Sec. 9 of the Constitution, to establish an alleged
claim of the plaintiffs against the State, and have the value
of certain bonds appropriated to its satisfaction. The cause
was argued at the last term, but the opinion was not
announced until the present term.

The case developed by the pleadings is, substantially, as
follows:

"The Chatham Railroad Company" was a corporation
organized under and in pursuance of the statute (Pr. Acts
1860-'61, ch. 129), and the name thereof was afterwards
changed by the statute (Acts 1871-'72, ch. 11) to that of
"The Raleigh and Augusta Air-Line Railroad Company."
But, before this change of name, the statute (Acts 1863, ch.
14) provided, in favor of this company, as follows:

"*The General Assembly of North Carolina do enact:*

"SECTION 1. That, to enable the Chatham Railroad Company
to finish their road, the Public Treasurer is hereby authorized
and directed to deliver to the president of the said railroad
company the coupon bonds of the State of one thousand
dollars ($1,000) each, to an amount not exceeding two mil-

lion dollars ($2,000,000), signed by the Governor, counter-signed by the Public Treasurer, and sealed with the great seal of the State, bearing six per cent. interest, the principal payable at the end of thirty years from the date thereof, and the coupons of interest payable semi-annually, in such form as the Public Treasurer may direct—principal and interest payable at such time and place as he may prescribe.

"Sec. 2. Before the Public Treasurer shall deliver any of the said bonds hereby authorized, the president of said Chatham Railroad Company shall deposit with the Public Treasurer the coupon bonds of the company, signed by him and sealed with the company's seal, for the same amount, and bearing the same interest and date, the principal and coupons payable at the same time and place as those of the State hereinbefore directed to be issued and paid over to said company; and, to secure the same, principal and interest, of said bonds issued by the company, the State of North Carolina shall have, by this act, a lien upon all the estate of the same, real or personal, which they may now have, or may hereafter acquire, between the point of intersection with the Western Railroad and the South Carolina State line, includ-ing that at both points, together with all rights, franchises and powers thereto belonging, or that may hereafter belong to said company, in respect to that portion of the line, which lien shall be more effectually secured by a first mortgage, executed by said company to the State and registered in the Register's office in the county of Wake, and in the office of the Secretary of State; and, in case of failure of said com-pany to pay the semi-annu 1 interest on their bonds for twenty-four months after such interest shall become due, or to pay the principal on said bonds for twelve months after ther maturity, the Board of Internal Improvements, for and in behalf of the State, may enter upon and take possession of all the property hereinbefore specified, and dispose of the same by sale, so as to protect the State.

"SEC. 3. The Chatham Railroad Company may, at any time before maturity, discharge the bonds of said company deposited with the Public Treasurer by substituting in lieu thereof coupon bonds of the State, or other indebtedness of the State, or payment in national currency."

The State bonds thus authorized were issued and delivered to the railroad company mentioned, and this company executed and delivered to the Public Treasurer for the State its first mortgage bonds for the like amount, and executed its first mortgage to secure the same, as contemplated by the statute just recited, which was duly registered, for the purpose therein specified.

Afterwards, in the course of business, the plaintiffs became the owners of one hundred and forty State bonds so issued, receiving the same from a party who bought from them the iron for the railroad of the railroad company mentioned, which iron was placed upon their road. It was conceded that these bonds, and all the State bonds so issued, were unwarranted by the Constitution of this State, and are void.

Afterwards, the plaintiffs brought their action in the Circuit Court of the United States, to compel the party from whom they received the bonds last mentioned (the railroad company and others) to pay them for the iron so supplied by them. This action was determined adversely to them in the Circuit and Supreme Courts of the United States. See *Baltzer* v. *Railroad Co.*, 115 U. S. R., 634.

About the 15th of August, 1873, as allowed by the third section of the statute above recited, and other statutory provisions afterwards enacted, the railroad company surrendered to the Public Treasurer of the State 1703 of the invalid State bonds so received by it, and in place of the balance of the 2000 of them so received by it, it delivered to the Public Treasurer 297 valid bonds of the State, each of the denomination of $1,000, which last mentioned bonds were

burned by the authorities of the State, as was done ordinarily with such bonds when discharged. The defendant alleges that the plaintiffs had full notice of the surrender of the State bonds to its Treasurer, and of the first mortgage bonds to the railroad company, and might have interfered and set up opposition then to his claim, but failed to do so, &c.

The plaintiffs, among other things, allege, in the complaint, as follows:

"18. And these plaintiffs further state, upon information and belief, that the said 297 valid coupon bonds of the State thus deposited are a trust for the benefit of the holders of said 297 high numbered bonds, and are not, and never have been, the property of the said State, and that the said State is in no way entitled to the use and benefit thereof, but said State holds them only as a trust for those who advanced the consideration upon the faith of the validity of the said high numbered bonds, and that it received the said valid bonds and held them subject to the trust, as aforesaid, and that they are, in fact, the property of these plaintiffs and of other holders of outstanding high numbered bonds, and that said State has no right, title or claim thereto.

"19. And these plaintiffs further state, upon information and belief, that the said State has obtained and holds the said valid State bonds, deposited with it in the aforesaid exchanges and substitution, without parting with any value whatever, other than the original issues of high numbered bonds claimed to be invalid, as aforesaid, and that the State has, at all times, declined to acknowledge the validity of the said high numbered State bonds, and still continues to so decline, and that the said deposit is, in law and equity, a deposit of the said valid State bonds in trust for the benefit of the plaintiffs, and the other holders of the said high numbered State bonds, and that the said State is accountable to

these plaintiffs for their pro-rata share of the valid bonds thus, as aforesaid, deposited."

The defendant alleges numerous grounds of defence. The pleadings are very voluminous, but the above statement is sufficiently full for the purpose of a proper understanding of the opinion of the Court.

Before the argument began, the counsel for the State moved " to dismiss the action and claim of plaintiffs upon the ground that this Court has no jurisdiction of the subject matter of the action."

*Messrs. T. C. Fuller* and *F. Kingsbury Curtis,* for the plaintiffs.

*The Attorney-General* and *Mr. C. M. Busbee,* for the defendant.

MERRIMON, J.—after stating the case: The Constitution (Art. 4, § 9) provides that "The Supreme Court shall have original jurisdiction to hear claims against the State, but its decisions shall be merely recommendatory; no process in the nature of execution shall issue thereon; they shall be reported to the next session of the General Assembly for its action." This provision constituted part of the Constitution as established in 1868, and gives this Court such jurisdiction, generally, of claims against the State. It was afterwards, in the year 1880, modified by an amendment of the Constitution (Art. 1, § 6), which provides, among other things, as follows: " Nor shall the General Assembly assume, or pay, or authorize the collection of any tax to pay, either directly or indirectly, expressed or implied, any debt or bond, incurred or issued by authority of the convention of the year one thousand eight hundred and sixty-eight, nor any debt or bond incurred or issued by the Legislature of the year one thousand eight hundred and sixty-eight, either at the special session of the year one thousand eight hundred and sixty-eight, or at its regular session of the year

one thousand eight hundred and sixty-eight, one thousand eight hundred and sixty-nine, and one thousand eight hundred and seventy, except the bonds issued to fund the interest on the old debts of the State, unless the proposition to pay the same shall have first been submitted to the people, and by them ratified by a vote of all the qualified voters of the State at a regular election held for that purpose."

This amendatory clause was interpreted by this Court in *Horne* v. *The State*, 84 N. C., 362, in which it was held that the Court's jurisdiction of claims against the State was so abridged as that it did not thereafter have jurisdiction of the class of claims coming within the inhibition of the clause above recited. The ground of that decision is, that inasmuch as the General Assembly was prohibited by the Constitution " to assume, or pay, or authorize the collection of any tax to pay, either directly or indirectly, expressed or implied, any debt or bond of the class specified," it would be an act of supererogation, an act obnoxious to the charge of presumption, for this Court, in the face of the unmistakable will of the people, declared in the organic law of the land, to recommend to the Legislature the payment of this claim." That case was well considered, and it seems to us that it is in entire harmony with the spirit and effect of the clause of the Constitution interpreted, and, indeed, a necessary consequence growing out of it. It would be idle, futile and ridiculous for this Court to declare and adjudge the validity of a claim against the State, and recommend to the General Assembly to provide for its payment, when the Constitution expressly forbids it to pay, or provide for the payment, of such a claim. The obvious purpose of the jurisdiction so conferred was to have the Court settle and adjudge the legal validity of claims, to the end the Legislature may provide for their payment. But, wherefore adjudge that a claim is valid if the Legislature cannot provide for its payment? The purpose and the jurisdiction

are swept away by the amendment mentioned as to the claims embraced by it.

If, then, the claim of the plaintiffs comes within the inhibition last mentioned of the Constitution, the Court has not jurisdiction of it, and the motion of the counsel of the State to dismiss the action must be allowed. Does the claim come within that inhibition? We think it does, and for the reasons we will now proceed to state.

It was properly conceded that what purported to be two thousand bonds of the State, each of the denomination of one thousand dollars, issued and delivered to the Chatham Railroad Company, were nullities, and of themselves created no obligation upon the State to pay them, and that they come within the inhibitory clause of the Constitution mentioned. They are, therefore, not within the jurisdiction of the Court.

The plaintiffs, in the course of business, took, and have, one hundred and forty of such bonds, representing one hundred and forty thousand dollars and the interest due thereon. Their claim, however, as they contend, is not founded directly, if at all, upon them, but they contend that they were entitled in equity to have the money they represent paid to them out of the proceeds of the sale of the first mortgage bonds of the railroad company deposited with the State to indemnify it against loss, if it should have to pay the invalid bonds. They contend, further, that, inasmuch as the railroad company returned to the State its invalid bonds mentioned, except two hundred and ninety-seven of them—and as to these, it paid to the State in lieu of them their face value in other valid bonds of the State, which the State received and burned in the course of its practice as to its bonds paid and discharged; and inasmuch as, thereupon, the State returned and surrendered to the railroad company its first mortgage bonds mentioned, they are entitled to have the State pay the money so due them. They insist that the State paid nothing for its valid bonds, to the amount of two

hundred and ninety-seven thousand dollars paid to it by the railroad company in lieu of the first mortgage bonds of the same amount, and in substitution for two hundred and ninety-seven of the State's invalid bonds mentioned, not surrendered; that the State so received its valid bonds, as, and in contemplation of law, they constituted a trust fund for the benefit of its holders of the outstanding two hundred and ninety-seven invalid bonds.

We express no opinion as to the correctness of this contention of the plaintiffs. Whatever may be their equitable rights, we think it clear that the State did not intend to receive its valid bonds in lieu of its invalid ones, and in substitution of the same amount of the first mortgage bonds of the railroad company, and *to hold and treat them as a trust fund for the plaintiff,* and others having like claims. There is neither statute nor other legislative declaration showing such purpose, in terms or by reasonable implication. The contrary appears. At the time the valid bonds were so received by the State, there prevailed great public confusion and financial distrust, growing out of disorders resulting from the late civil war and the notoriously reckless and fraudulent legislation of the years 1868 and 1869. We know this, from the clear history of that time in this State, as well as from enactments of the Legislatures themselves. The valid bonds of the State had no settled value; they were sold in the market for prices purely speculative. In such time of public distress and discontent, no one could foresee when or how the valid debt of the State could be paid; no one expected that its void bonds, many of them tainted with the grossest fraud, would be paid at all.

While the State, through its constituted authorities, soon after their issue, regarded and treated the bonds issued to the Chatham Railroad Company as invalid, it was apprehended, not unreasonably, that they might be purchased

innocently, in some instances, in the course of business, at some price, and, in other instances, by mere speculators in the markets, who would insist upon their validity and payment, and that the State would be greatly annoyed and harassed in a variety of ways, putting it to great trouble and expense to defend itself against such unfounded claims. In view of this state of things, the valid bonds were so received, not for the purpose of paying, directly or indirectly, the invalid ones, but to indemnify the State against cost and expenditure incurred in resisting them. Hence, the valid bonds were treated as the absolute property of the State, and burned, having served their final purpose. The intention was not to provide a fund to pay the invalid bonds, but to guard against them ever thereafter.

In view of such purpose, can there be a reasonable doubt that the inhibitory clause of the Constitution under consideration was intended to embrace not only the invalid bonds themselves, but, as well and as certainly, every claim and liability, legal or equitable, founded upon, growing out of, or substituted for them? In view of that purpose, if the General Assembly should pass an act providing for the payment of the plaintiffs' claim, would not such an act, in legal contemplation and effect, provide for such indirect payment of the invalid bonds held by the plaintiffs as is prohibited? Can it be that the inhibition intends to leave the General Assembly at liberty to provide for the payment of the equitable claims substituted for the invalid ones held by the plaintiffs? Can this be, in the absence of any provisions to that effect, and the further fact that the State disposed of, surrendered, the first mortgage bonds of the railroad company, and treated as its own property its valid bonds substituted for them, as to which the plaintiffs' alleged equity arises? We think not. The purpose of the inhibitory clause is very comprehensive; it contains but a single exceptive provision, and that is in express terms. The terms employed in it are

as broad and sweeping as they can be. The language is: "Nor shall the General Assembly *assume or pay*, or authorize the collection of any tax to pay, either *directly or indirectly, expressed or implied*, any debt or bond incurred or issued," &c. By the terms "any debt," so employed, is not meant a *debt* in a technical sense, as to form and character, but, in a general sense, that of any liability *incurred* to pay money to a party claiming it—that of a claim. Now, if the plaintiffs' claim—their debt, in a general sense—exists, and is well founded, and the State is liable for it—is bound in equity or otherwise to pay it—such liability was incurred by the General Assembly in 1868, because the contract constituting the groundwork of it, and out of which it springs, was then concluded and made effectual. The statute cited, authorizing the exchange of bonds between the State and the railroad company, was enacted in August of that year; the exchange was made, and the liability now insisted on was incurred then, if at all.

The studied comprehensiveness of the inhibition further appears from the other words, "to pay, either directly or indirectly, expressed or implied, any debt or bond incurred or issued," &c.—that is, such debts or bonds shall not be paid *as such*, nor shall they be paid in any way, "indirectly," as under the guise or semblance of another debt or bond, or transaction, or any other substituted liability or obligation growing out of the debt or bond, or arising otherwise, whether such indirect payment be "expressed" in terms or in any way "implied." The comprehensive purpose is to prohibit and prevent the payment of the debts and bonds referred to in any possible way, unless with the sanction of the people, expressed by a majority of the qualified voters of the State.

It is no sufficient answer to what has been said, to say that the plaintiffs do not ask the State to pay its invalid bonds held by them—that they only ask it to pay their

*claim*, on the ground that it is properly chargeable *in equity* for their benefit, with its valid bonds, which it received from the railroad company, as above explained, in l eu of part of its invalid bonds, and in place of part of that company's first mortgage bonds, all of which were improperly surrendered to it by the State, and out of which they were entitled to have their claim satisfied, as they contend.. This argument is without force, because, as we have already seen, the State held and treated the first mortgage bonds of the company as for its sole benefit; surrendered them to the company, receiving in lieu for them part of its invalid bonds, and certain of its valid bonds, which latter it held and treated as its absolute property, and burned them, thus clearly showing that it did not recognize its liability, in any way, to pay the plaintiffs' claim, or any claim like it. In pursuance of its agreement with the railroad company, it received, and intended to receive, its valid bonds in the place of its invalid ones. To pay the valid ones thus received, would, it seems to us, in contemplation of the inhibitory clause under consideration, be to pay, indirectly, the invalid ones they represent, whether the purpose be expressed or implied. We cannot doubt that the purpose is to forbid and prevent such payment, hence, without reference to the merits of the plaintiffs' claim, in any aspect of it, this Court has not jurisdiction thereof.

It was contended in the argument that the inhibitory clause of the Constitution which we have applied, is inoperative and void as to the plaintiffs, because it denies and destroys their remedy, and was, therefore, in conflict with the Constitution of the United States.

This contention is unfounded. Parties cannot sue or have their action against the State, except as the same may be allowed by the Constitution or statute, and they must accept or have their judicial remedy only in the cases and as to the matters and causes of action prescribed.

The remedy prescribed and allowed by the Constitution (Art. 4, § 9), invoked by the plaintiffs, is not a judicial remedy in any proper sense. This Court has, by virtue of this provision, jurisdiction "to hear claims," but its decisions as to them are not conclusive, are "merely recommendatory;" no process, final or otherwise, can be issued upon them; the Court has no authority to enforce them in any way. The simple purpose is to have the Court decide that such claims are legal, or illegal. in proper cases.

This Court decided in *Horne* v. *The State,* cited, *supra,* that an abridgment of its jurisdiction, as to claims against the State, even after the suit had been brought was not inhibited by the Constitution of the United States. That case followed, and cited with approval, *Railroad Co.* v. *Tennessee,* 101 U. S. R., 337; *Railroad Co.* v. *Alabama, Id.* 832—both these cases being almost directly in point.

We think we ought to add, that if the facts are, as they appear strongly in the pleadings, indeed such, the plaintiffs' claim, as against some party, is one of real merit. They supplied the iron now on the railroad of the railroad company mentioned, and it seems that they have been paid but a small part of the large sum of money it cost them. We do not mean to intimate that the State is liable, legally or otherwise, for their debt, but surely some party ought to pay it.

The motion to dismiss the claim must be allowed.

Action dismissed.